IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA

| JAMES EDWARD SHAW, | ) |
| --- | --- |
| Plaintiff, | ) |
| v. | ) Case No. CIV-11-383-FHS-SPS |
| CAROLYN W. COLVIN, Acting Commissioner of the Social Security Administration,[1] | ) |
| Defendant. | ) |

## REPORT AND RECOMMENDATION

The claimant James Edward Shaw requests judicial review of a denial of benefits by the Commissioner of the Social Security Administration pursuant to 42 U.S.C. § 405(g). He appeals the Commissioner's decision and asserts the Administrative Law Judge ("ALJ") erred in determining he was not disabled. For the reasons set forth below, the Commissioner's decision should be REVERSED and the case REMANDED for further proceedings.

**Social Security Law and Standard of Review**

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment[.]" 42 U.S.C. § 423(d)(1)(A). A claimant is disabled under the Social Security Act "only if his physical or mental impairment or impairments are of such

---

[1] On February 14, 2013, Carolyn W. Colvin became the Acting Commissioner of Social Security. In accordance with Fed. R. Civ. P. 25(d), Ms. Colvin is substituted for Michael J. Astrue as the Defendant in this action.

severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]" *Id*. § 423 (d)(2)(A). Social security regulations implement a five-step sequential process to evaluate a disability claim. *See* 20 C.F.R. §§ 404.1520, 416.920.[2]

Section 405(g) limits the scope of judicial review of the Commissioner's decision to two inquiries: whether the decision was supported by substantial evidence and whether correct legal standards were applied. *See Hawkins v. Chater*, 113 F.3d 1162, 1164 (10th Cir. 1997). Substantial evidence is "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401 (1971), *quoting Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). *See also Clifton v. Chater*, 79 F.3d 1007, 1009 (10th Cir. 1996). The Court may not reweigh the evidence or substitute its discretion for the Commissioner's. *See Casias v. Secretary of Health & Human Services*, 933 F.2d 799, 800 (10th Cir. 1991). But the Court must review the record as a whole, and "[t]he

---

[2] Step One requires the claimant to establish that he is not engaged in substantial gainful activity. Step Two requires the claimant to establish that he has a medically severe impairment (or combination of impairments) that significantly limits his ability to do basic work activities. If the claimant *is* engaged in substantial gainful activity, or his impairment *is not* medically severe, disability benefits are denied. If he *does* have a medically severe impairment, it is measured at step three against the listed impairments in 20 C.F.R. Part 404, Subpt. P, App. 1. If the claimant has a listed (or "medically equivalent") impairment, he is regarded as disabled and awarded benefits without further inquiry. Otherwise, the evaluation proceeds to step four, where the claimant must show that he lacks the residual functional capacity ("RFC") to return to his past relevant work. At step five, the burden shifts to the Commissioner to show there is significant work in the national economy that the claimant *can* perform, given his age, education, work experience, and RFC. Disability benefits are denied if the claimant can return to any of his past relevant work or if his RFC does not preclude alternative work. *See generally Williams v. Bowen*, 844 F.2d 748, 750-51 (10th Cir. 1988).

substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951). *See also Casias*, 933 F.2d at 800-01.

**Claimant's Background**

The claimant was born December 17, 1968, and was forty years old at the time of the most recent administrative hearing. (Tr. 523, 676). He completed four years of college, and has worked as a pumper/gauger and sewing machine operator. (Tr. 592, 785). The claimant alleges he has been unable to work since January 15, 2001, due to extreme anxiety, depression, psychosis, right hand problems, agoraphobia, angina, and high blood pressure. (Tr. 577, 779).

**Procedural History**

On February 2, 2004, the claimant applied for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401-434, and supplemental security income benefits under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-85. His applications were denied. ALJ Larry Weber conducted an administrative hearing and determined that the claimant was not disabled in a written opinion dated October 26, 2005. (Tr. 271-282). On June 12, 2006, the Appeals Council issued an order remanding the case back to the ALJ for further proceedings. (Tr. 284-286). ALJ Michael A. Kirkpatrick held a hearing and also determined that the claimant was not disabled in a written opinion dated April 3, 2007. (Tr. 599-610). The Appeals Council then denied review, but this Court reversed on appeal in Case No. CIV-07-384-SPS and remanded the case for further proceedings. (Tr. 615-628). ALJ Osly F. Deramus held a hearing and

determined that the claimant was not disabled in a written opinion dated August 31, 2009. (Tr. 577-594). The Appeals Council again denied review on August 31, 2011, so ALJ Deramus's August 31, 2009 opinion represents the Commissioner's final decision for purposes of this appeal. See 20 C.F.R. §§ 404.981, 416.1481.

## Decision of the Administrative Law Judge

ALJ Deramus made his decision at step five of the sequential evaluation. He found that the claimant had the residual functional capacity (RFC) to perform a narrowed range of light work, 20 C.F.R. §§ 404.1567(b) and 416.967(b), *i. e.*, he could lift/carry twenty pounds occasionally and ten pounds frequently, and sit/stand/walk six hours in an eight-hour workday, except that the claimant could only sustain concentration necessary for unskilled work; he could not use his right hand for repetitive handling; he could perform simple, routine, unskilled tasks; he could perform detailed, semi-skilled tasks, but not complex tasks; and he required a task-oriented job which did not involve interaction with the general public. (Tr. 581). The ALJ concluded that although the claimant could not return to his past relevant work, he was nevertheless not disabled because there was work that he could perform, *i. e.*, housekeeping cleaner, conveyor line bakery worker, and flagger (construction). (Tr. 593).

## Review

The claimant contends that the ALJ erred: (i) by failing to discuss all of the evidence in the record as ordered by this Court in its previous opinion, specifically evidence from Mental Health Services of Southern Oklahoma (MHSO), relevant global assessment of functioning (GAF) scores, and the findings of Annette Miles, Ph.D.; and

(ii) by failing to support his findings with substantial evidence.[3] The Court agrees with the claimant's first contention, particularly as to the claimant's mental impairments, and the decision of the Commissioner should therefore be reversed.

The claimant has the severe impairments of osteoarthritis of the right hand, status post right wrist surgery, generalized anxiety disorder, depression, and panic attacks. (Tr. 579). The relevant evidence as to the claimant's mental impairments reveal a number of counseling and treatment records from MHSO. On July 3, 2003, the claimant was assessed with general anxiety disorder, major depression d/o recurrent with psychosis, high blood pressure, and problems with his social environment, and assigned a GAF of 60. (Tr. 174-186). Further treatment notes from November 2005 through February 2006 indicate that the claimant continued to struggle with his depression that related to childhood abuse from his father, and the claimant was diagnosed with a GAF of 40 on November 3, 2005. (Tr. 466-483). The discharge/continuing care plan articulated by the primary clinician stated that the claimant would be discharged when he could return to his previous level of functioning within his home and the community with a referral to receive medication from a private physician, but that it was projected that the claimant would be in need of long term care due to his diagnosed mood disorder (major depression disorder with psychotic features, PTSD, obsessive compulsive disorder, and panic disorder with agoraphobia). (Tr. 483). A year later, the claimant was assessed at MHSO with a GAF of 43 at the time, with a highest GAF in the past year being 60. (Tr. 927). In

---

[3] The claimant also argued that the Administrative Transcript was not complete, but that defect was cured when the Social Security Administrative filed a Supplemental Administrative Transcript and the claimant filed a subsequent brief. *See* Docket No. 20.

June 2007, an MHSO counselor assessed the claimant with a GAF of 45, and a highest level in the past year of 43. (Tr. 972). Notes from this assessment indicate that the claimant had been further diagnosed with bipolar disorder, OCD, PTSD, and panic disorder, that he had made some improvement on past goals but had problems with paranoia, depression, and anxiety and increased financial stress, and that his prognosis was fair. (Tr. 974). Dr. Zielinski of MHSO completed a Mental impairment questionnaire, checking off numerous signs and symptoms listed, and stated that the clinical findings to support the claimant's symptoms included severe mood swing, agitation, anxiety, auditory hallucinations and paranoia, sleep disturbance, and that the claimant was not a malingerer. (Tr. 1056). Dr. Zeilinski noted that treatment had been slow and that the claimant appeared to show little improvement, that the claimant's impairments could be expected to last longer than a year, and that the claimant's mental problems exacerbated his physical problems in his hands and shoulders. (Tr. 1057). He further opined that the claimant would have difficulty working due to his anxiety and paranoia, and that the claimant had extreme functional limitations in all areas, as well as continued episodes of deterioration. (Tr. 1058). A June 2008 MHSO assessment stated that the claimant had a GAF of 47, with the highest in the past year being a 46. (Tr. 1115). At this assessment, the counselor noted that the claimant had been in outpatient treatment over five years, had poor esteem and coping skills, but that he had a good prognosis with ongoing therapy and medication compliance. (Tr. 1117).

Earlier medical records from May to October 2000, indicate that the claimant was suffering from his panic disorder and wrist injury to the point that his doctor, C.F.

Mynatt, informed his employer that his symptoms were at least temporarily disabling. (Tr. 853-856). Dr. Gerald Ball completed a mental status evaluation on April 7, 2004, where the claimant reported taking the prescription medications atenolol, Zoloft, Seroquel, and Clonopin, and that the medications helped with his anxiety, hearing voices, and his Obsessive Compulsive Disorder. Dr. Ball diagnosed the claimant with major depression, recurrent, severe with psychotic features, obsessive compulsive disorder, high blood pressure and injury to right hand, and problems in social environment. He also noted that the claimant had a GAF of 47. (Tr. 159-161). In May 2004, a state reviewing physician found he was moderately limited in the ability to understand and remember detailed instructions and the ability to carry out detailed instructions, and was markedly limited in the ability to interact appropriately with the general public, but that he could adapt to a work environment. (Tr. 199-200). On June 20, 2006, Dr. Everett Bayne, M.D., completed a consultative psychiatric evaluation for mental disorders as to the claimant. Dr. Bayne also diagnosed the claimant with major depression – recurrent – with psychotic features and panic disorder without agoraphobia, and assessed the claimant with a GAF of 55. (Tr. 879). On July 31, 2006, Dr. Miles conducted a consultative mental status examination. Dr. Miles declined to provide a prognosis because she felt the claimant was malingering and that he had not given his best effort on the examination. She indicated a provisional diagnosis of rule out malingering, rule out panic disorder with agoraphobia, rule out dysthymic disorder early onset, as well as high blood pressure and unemployment. She assessed the claimant with a GAF of 51. (Tr. 312).

In his written opinion, the ALJ summarized the claimant's hearing testimony, as well as the medical evidence. The ALJ carefully recounted the treatment records from the claimant's counseling and medication management sessions at MHSO, from Dr. Falsarella, as well as from the three consultative examiners, Dr. Ball, Dr. Miles, and Dr. Bayne. In addition, the ALJ noted records from Dr. Mynatt and Dr. Zielinski. As to the various GAF scores in the record, the ALJ recited boilerplate language that included a reminder that the inability to keep a job is first discussed with a GAF score of 50, and noted that individual GAF scores have little probative value and therefore that he had not "employed isolated GAF scores" in making his decision. The ALJ recited Dr. Ball's assigned GAF of 47, but interpreted that score as not substantiating a diminished ability to work. The ALJ further recited Dr. Bayne's assigned GAF of 55, as well as his opinion that the claimant was employable. (Tr. 587-588). The ALJ then noted that there were several GAF scores from MHSO, but rejected them because i) they were from counselors whose opinions were "never potentially entitled to controlling weight" (despite noting this Court's reversal, in part, for failing to properly explain why the scores were being rejected), ii) GAF scores have "little probative value with respect to the work issue," iii) and that the scores themselves were based on "recitation of claimant's subjective complaints and alleged functional limitations, neither of which the undersigned finds to be fully credible." (Tr. 588).

The claimant testified at three separate hearings as to his mental impairments. In June 2005, he stated he did not drive because it made him nervous to the point of having panic attacks, that he never knew how he would feel when he woke up in the morning,

-8-

and that social situations made him very nervous. (Tr. 525-528). He stated that he heard voices, sometimes every day and sometimes once a week, and that it varied according to the amount of stress in his life. (Tr. 528). He stated that he avoided social situations, including grocery shopping, that he only visited with family, and that he was in counseling at MHSO. (Tr. 530). He explained that he had a garden and that tending it helped him to relax, that he had rigged his tiller to only require the use of his left hand, and that he also took care of their chickens. (Tr. 530). He testified that his medications helped him, but that his memory was affected, that he struggles with concentration when reading, and also struggles with sleep but less so with his medications. (Tr. 534-535). At his December 2006 hearing, the claimant testified that he attended counseling every two weeks. (Tr. 554). He also indicated that he did not leave his home two to three days a week due to his agoraphobia, and that he experiences panic attacks that are brought on by interacting with people outside his family, and driving. (Tr. 554-555). He stated that his medications helped to manage his symptoms but that he still had hallucinations, that he had to be accompanied when going to the grocery store, and that he still struggled to sleep at night. (Tr. 556-557). At the July 2009 hearing, the claimant testified that he was still being treated for his mental impairments, taking medications, and going to counseling. (Tr. 681). He stated that he did not know what a good day was, he still mowed his law and kept his garden, and he did not get along with other people (Tr. 682). He stated that he had been experiencing frequent panic attacks in anticipation of his hearing, and that he still struggled with hearing voices and paranoia and took medication to manage those symptoms. (Tr. 683-684).

The ALJ erred in analyzing the "other source" evidence as to the claimant's mental impairments. Social security regulations provide for the proper consideration of "other source" opinions such as the ones provided in the MHSO records. *See* 20 C.F.R. § 416.913(d) ("Other sources include, but are not limited to . . . therapists."). S*ee also Holcomb v. Astrue*, 389 Fed. Appx. 757, 759 n.2 (10th Cir. 2010) (assuming without deciding that licensed professional counselors can also be considered "other sources"); *Frantz v. Astrue*, 509 F.3d 1299, 1302 (10th Cir. 2007) (noting that other source opinions should be evaluated with the relevant evidence "on key issues such as impairment severity and functional effects" and by considering 20 C.F.R. §§ 404.1527(d), 416.927(d) factors in determining the weight of these opinions), *quoting* Soc. Sec. Rul. 06-03p, 2006 WL 2329939 at *1, *6 (discussing considerations of evidence from sources who are not acceptable medical sources and stating that "[a]lthough there is a distinction between what an adjudicator must consider and what the adjudicator must explain in the disability determination or decision, the adjudicator generally should explain the weight given to opinions from these 'other sources,' or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case."). The relevant factors for evaluating opinion evidence from other sources are: (i) the length of the relationship and frequency of contact; (ii) whether the opinion is consistent with other evidence; (iii) the extent the source provides relevant supporting evidence; (iv) how well the source's opinion is explained; (v) whether the claimant's impairment is related to a source's specialty or area of expertise; and (vi) any

other supporting or refuting factors. *See* Soc. Sec. Rul. 06-03p at *4-5; 20 C.F.R. §§ 404.1527(d), 416.927(d).

In his written opinion, the ALJ acknowledged the existence of these other source opinions, but refused to give them any weight because he stated that they were "never" entitled to controlling weight. However, other source opinions are valuable and can be instructive on "key issues such as impairment severity and functional effects." *Bowman v. Astrue*, 511 F.3d 1270, 1274-75 (10th Cir. 2008) (discussing the application of SSR 06-03p and noting that "'[o]pinions from [other sources] . . . are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file.'"), *quoting* Soc. Sec. Rul., 06-03p, 2006 WL 2329939, at *3. In fact, Social Security Regulation 06-03p states, "[D]epending on the particular facts in a case, and after applying the factors for weighing opinion evidence, an opinion from a medical source who is not an 'acceptable medical source' may outweigh the opinion of an 'acceptable medical source,' including the medical opinion of a treating source." SSR 06-03p, 2006 WL 2329939, at *5 (Aug. 9, 2006). This is especially true when, as here, the ALJ's refusal to even consider the evidence from MHSO amounts to ignoring evidence that could support a finding of disability. *See Clifton v. Chater*, 79 F.3d 1007, 1010 (10th Cir. 1996) ("[I]n addition to discussing the evidence supporting his decision, the ALJ also must discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects."), *citing Vincent ex rel. Vincent v. Heckler*, 739 F.2d 1393, 1394-95 (9th Cir. 1984). *See also Hardman v. Barnhart*, 362 F.3d 676, 681 (10th Cir. 2004) (noting that the ALJ may not "pick and

choose among medical reports, using portions of evidence favorable to his position while ignoring other evidence."), *citing Switzer v. Heckler*, 742 F.2d 382, 385-86 (7th Cir. 1984) ("Th[e] report is uncontradicted and the Secretary's attempt to use only the portions favorable to her position, while ignoring other parts, is improper.") [citations omitted];.*Briggs ex rel. Briggs v. Massanari*, 248 F.3d 1235, 1239 (10th Cir. 2001) ("Although the ALJ need not discuss all of the evidence in the record, he may not ignore evidence that does not support his decision, especially when that evidence is significantly probative.") [quotation omitted].

Last, although the ALJ recited *some* of the GAF scores in the record, he failed to address their effect on his assessment of the claimant's RFC, instead using boilerplate language to describe the background of GAF scores and stating that they should not be used in isolation. *See Hardman v. Barnhart*, 362 F.3d 676, 679 (10th Cir. 2004) ("[B]oilerplate language fails to inform us in a meaningful, reviewable way of the specific evidence the ALJ considered in determining that claimant's complaints were not credible."), *citing Briggs ex rel. Briggs v. Massanari*, 248 F.3d at 1239. Indeed, the ALJ mostly referred to the older GAF scores that were well over 50, and refused to acknowledge the yearly assessments done by MHSO from 2005 to 2008, all of which assessed the claimant below 50 and only indicated that the claimant may have had a GAF of 60 at some time in 2006. "[A] GAF score between 41 and 50 indicates [s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e. g., no friends, inability to keep a job)." *Lee v. Barnhart*, 117 Fed. Appx. 674, 678 (10th Cir. 2004)

[quotation omitted] [unpublished opinion]. "Although the GAF rating may indicate problems that do not necessarily relate to the ability to hold a job," as the ALJ accurately stated in *Oslin v. Barnhart*, 69 Fed. Appx. 942, 947 (10th Cir. 2003) [unpublished opinion], "[a] GAF score of fifty or less . . . *does* suggest an inability to keep a job." *Lee*, 117 Fed. Appx. at 678 [emphasis added], *citing Oslin*, 69 Fed. Appx. at 947. Thus, the ALJ should have considered whether the claimant's consistently substandard GAF scores from 2005 to 2008 were due to occupational factors, and he was not entitled to completely disregard them simply because they came from an "other source" opinion. *See, e. g., Givens v. Astrue*, 251 Fed. Appx. 561, 567 n. 4 (10th Cir. 2007) (noting that "the Commissioner argues that a low GAF score may indicate problems that do not necessarily relate to the ability to hold a job[,]" but finding that "[e]ven assuming this is true, the ALJ's decision does not indicate he reached the conclusion that Ms. Givens' low GAF score was due to non-occupationally-related factors.") [quotation marks omitted] [unpublished opinion].

Because the ALJ failed to properly evaluate the claimant's mental impairments, the decision of the Commissioner is therefore reversed and the case remanded to the ALJ for further analysis of the claimant's mental impairments. If such analysis results in any changes to the claimant's RFC, the ALJ should re-determine what work the claimant can perform, if any, and ultimately whether he is disabled.

**Conclusion**

In summary, the undersigned Magistrate Judge PROPOSES a finding by the Court that correct legal standards were not applied and that the decision of the Commissioner is

therefore not supported by substantial evidence. The undersigned Magistrate Judge therefore RECOMMENDS that the Commissioner of the Social Security Administration's decision be REVERSED and the case REMANDED to the ALJ for further proceedings. Any objections to this Report and Recommendation must be filed within fourteen days. *See* Fed. R. Civ. P. 72(b).

**DATED** this 11th day of March, 2013.

_____
Steven P. Shreder
United States Magistrate Judge
Eastern District of Oklahoma